Filed 8/23/21  P. v. Rizo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C088543 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF175787 ) |
| v. | |
| CHRISTIAN RIZO, | |
| Defendant and Appellant. | |

Defendant is a member of the Varrio Bosque Norteño (VBN) criminal street gang in Woodland.  In the early a.m. hours of June 29, 2016, defendant and Jose Epps were passengers in A.P.'s car in the Four Corners area of Woodland, a well-known Norteño area.[1]  Defendant or Epps directed A.P. to turn around and stop her car for purposes of

---

[1]  Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to some individuals by first name and last initial and thereafter by first name only, except where either an individual's first name is unusual or where there is a heightened need for privacy, in which case we refer to the individual by initials only.

1

doing a "check" on an individual they saw. That person, A.B., had previously been validated as a member of the Sureños, rivals to the Norteños, and he associated with East Side Trece, a Sureño subset in Woodland and enemy of VBN. Defendant and Epps got out of A.P.'s car and defendant shot A.B. with a shotgun, killing him. A jury found defendant guilty of first degree murder with the special circumstance that defendant intentionally killed A.B. while an active participant in a criminal street gang and that the murder was carried out to further the activities of the criminal street gang.[2] The jury also found defendant guilty of possession of a firearm by a prohibited person with a gang enhancement, carrying a loaded firearm while an active participant in a criminal street gang, and active participation in a criminal street gang. It also found true firearm use enhancements. The trial court sentenced defendant to life without the possibility of parole plus a determinate term of seven years.

Defendant asserts on appeal (1) the trial court abused its discretion in admitting cumulative and highly prejudicial gang evidence, (2) insufficient evidence supported the convictions of carrying a loaded firearm while an active participant in a criminal street gang and active participation in a criminal street gang and the true findings on the gang-related murder special circumstance allegation and the gang enhancement allegations, because there was insufficient evidence of VBN's primary activities, (3) the trial court abused its discretion in admitting evidence concerning: a third party who defendant asserts was culpable; defendant being "down for" the gang; defendant spending time in juvenile hall; and evidence concerning the victim's family situation, and (4) the cumulative effect of trial errors warrants reversal.

---

[2] As a shorthand, we will refer to this special circumstance allegation as the "gang-related murder special circumstance."

2

While we conclude the trial court did abuse its discretion in admitting testimony concerning A.B.'s family situation, this error was harmless. We find no merit to defendant's other claims of error.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged in count 1 with murder. (Pen. Code, § 187, subd. (a).)[3] Count 1 further alleged a gang-related murder special circumstance (§ 190.2, subd. (a)(22)), a gang enhancement allegation (§ 186.22, subd. (b)(1)), an allegation that defendant personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and an allegation that a principal to a violation of section 186.22, subdivision (b) discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (d), (e)(1)). Defendant was also charged with attempted murder (§§ 664, 187; count 2) with firearm enhancements; possession of a firearm by a prohibited person (§ 29815, subd. (a); count 3) with a gang enhancement (§ 186.22, subd. (b)(1)); carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subds. (a), (c)(3); count 4); and active participation in a criminal street gang (§ 186.22, subd. (a); count 5).[4]

### Prosecution Evidence

A.P. knew defendant as "Kiki."[5] She met him in the Four Corners area in Woodland. She knew defendant to be affiliated with the Northerner gang.

---

[3] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

[4] As a shorthand, we shall collectively refer to count 4, carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subds. (a), (c)(3) and count 5, active participation in a criminal street gang (§ 186.22, subd. (a)) as the substantive gang crime charges.

[5] In exchange for her testimony, A.P. pled no contest to being an accessory in connection with the shooting of A.B., with an enhancement for acting in association with a criminal

A.P. had a dark gray four-door Nissan Maxima. In the early morning hours of June 29, 2016, A.P. was with defendant in a parking lot in Four Corners. She identified herself and defendant in a surveillance video of the parking lot. Defendant was wearing a hoodie. At 12:38 a.m., defendant, A.P., and Jose Epps got into A.P.'s car and left the parking lot.[6] Defendant was in the front passenger seat.

Around the same time, Elizabeth H. was returning to her friend Jody B.'s apartment on Community Lane when she saw A.B. and his car in the street. When she went inside Jody's apartment, she told N.S., who was friends with A.B., that A.B. was outside. N.S. walked outside.[7] A.B. pulled his Mustang convertible from where it had been to another spot on the street. N.S. got into A.B.'s car and they smoked a cigarette and joked around.

Meanwhile, A.P. was driving on Community Lane. As they passed some vehicles, someone in the car insisted A.P. turn around and go back the other way, which she did. They spotted some people by a car. A.P. parked at a curb. Defendant and Epps wanted to "check somebody," meaning exchange words and see why they were in the neighborhood. According to A.P., both defendant and Epps got out of her car. After a few moments, A.P. heard one or two shots. Defendant and Epps got back into A.P.'s car, told her to go, and she drove off. They admonished her, "don't say anything." Later,

---

street gang. Her understanding was that she would be released on probation after she testified.

[6] Detective Pablo Gonzales, who investigated this case and who also testified as an expert in criminal street gangs as set forth *post*, testified that A.P. was not necessarily a member of VBN, but was an active participant. Gonzales also testified that Epps was not a VBN member, but rather a Northerner who either moved from Sacramento to Woodland or spent a lot of time in Woodland, and who identified with the Varrio Franklone subset. After he came to Woodland, he started hanging out with VBN. Gonzales testified Epps was an active participant with VBN.

[7] N.S. acknowledged he was in custody for "two stolen vehicle charges and jail suspension" at the time of his testimony.

4

A.P. noticed a cut on the right side of defendant's nose. A.P. drove to the other side of Woodland to get away from the area.

A.P. claimed she did not see anything in the hands of defendant or Epps when they got out of her car prior to the shooting. However, at some point she observed a "bundle" which she said the two men snuck into her car.

According to N.S., prior to the shooting, he and A.B. were sitting in A.B.'s Mustang when a dark-colored four-door car went by. They heard someone say something but did not pay attention. N.S. then saw the same car driving in the opposite direction, approaching A.B.'s car from the front. At some point, A.B. said, "oh, shit," and ducked. N.S. heard someone say, "fucking scraps." N.S. then heard two or three shots. A.B. stepped on the accelerator and N.S. fell out of the Mustang's open passenger door. As N.S. got up, he saw a person with a rifle or shotgun run back to the dark-colored car and get in the front passenger side. The car drove off. According to N.S., the shooter wore gray Dickies and a hoodie tight "up to his eyes."

N.S. ran to where A.B.'s car had crashed after A.B. stepped on the accelerator. A.B. was leaning back, trying to say something. N.S. tried to move A.B., with one hand on his head and one on his chest feeling for a pulse. N.S. screamed for help. People started coming outside.

Inside Jody's apartment, Elizabeth heard a loud boom. She ran outside, saw A.B.'s car across the street, and heard N.S. yelling for help. Elizabeth ran over to the car. It appeared to Elizabeth as though N.S. had his hands around A.B.'s neck and was choking him. However, at trial she acknowledged she he did not know if perhaps N.S. was feeling for a pulse. Elizabeth slapped N.S.'s hands away. N.S. said to Elizabeth, more than once, "I know who did it. It was Izzy. I recognize his belt buckle." Elizabeth tried to render aid to A.B. Elizabeth saw N.S. grab something from the car, wrap it up, and run away.

N.S. acknowledged he took a "rifle or some kind of gun" out of A.B.'s car. N.S. knew A.B. carried the gun, as he had showed it to him a couple of days earlier. N.S. testified he took the gun because he was angry and felt like retaliating. N.S. also told Elizabeth that A.B. had drugs on him, and told her to take them so A.B. would not "look bad."

Timothy B. recalled standing on Community Lane talking to a friend. A.B. was nearby in his Mustang convertible. A dark-colored car stopped towards the back of A.B.'s car. Someone got out of the dark-colored car and shot A.B. with a shotgun from a couple of feet away. The shooter fired two shots. Timothy testified the shooter had exited the vehicle from the rear passenger-side door, but made prior statements to the police that the shooter had come out of the front passenger-side door. The shooter had what Timothy believed to be a bandana covering his face, so Timothy could not tell who it was. After shooting A.B., the shooter "got back in the car and left."

Eventually, N.S. gave the gun he took from A.B.'s car to someone he saw on the street whom he knew and ran back toward the scene of the shooting. Kenneth P. testified he was living out of his car in a parking lot on Cottonwood Street. Kenneth saw N.S. running around and yelling. He was saying someone killed his friend. N.S. left an object wrapped in a towel by Kenneth's car. Kenneth initially assumed it was drugs wrapped in the towel, but, when he touched it, he realized it was a gun.

N.S. went to the area of an apartment complex where he knew a lot of Northerners hung out. He assumed the shooter had been a Northerner because he had said, "fuck the scraps." While he was there, he saw a dark-colored four-door car, and someone got out. N.S. yelled to a police officer, who had arrived at the scene, telling them, "that's the car," and "they shot my friend." He also yelled at the person who got out of the car, "you shot my friend." The person went into an apartment complex. As the evidence ultimately showed, this dark four-door car was not connected to the shooting.

6

At 12:41 a.m., Corporal Elliott and Officer Darryl Moore of the Woodland Police Department responded to the area. Elliot and Moore both saw a car traveling southbound on Community Lane and Moore stopped it. Moore talked to the occupants to assess whether they were involved in the shooting. As he was doing so, N.S. approached him, "very frantic, screaming, yelling," and waving his arms around, stating that the occupants of the car Moore had stopped "were not the ones that did it." N.S. pointed to a vehicle on West Cross Street and said, " 'There they go. Go get them,' " or " '[i]t was them.' "

Elliot saw the car N.S. had pointed out stop in front of apartments on West Cross Street and observed one person get out of the vehicle and go toward the apartments. Elliot got into his vehicle and chased down the car, a dark gray 2004 Mercedes four door. There were four people in the car. Elliot interacted with the occupants and looked in the car but did not see anything that would connect the vehicle or its occupants with the shooting.

At trial, N.S. explained why he identified the car and the shooter as Izzy: "It was after the aftermath of what happened, the whole thing after him -- I -- after I got up off the floor. They got away, or they drove away. I went down to see what was down with [A.B.], because he crashed, you know. I was holding him, and then everyone screaming for help, people came out, [Elizabeth] came out, and then I left [Elizabeth]. I went up the street, and when I was up the street, that's when the whole interaction with the officer happened, and this car stopped at the corner, and to me that was -- looked like [the] same car that had -- that they had drove away in, and I said, that's the people that did it, you know. I said, go get them, and somebody jumped out the car and went across the street. It looked like Izzy, to me." N.S. "could have sworn it looked like Izzy, his face. So that was it for me, that was in my head, that was Izzy."

Detective Tim Keeney reviewed surveillance video from the apartment complex on West Cross Street that showed two males running through the frame. One was N.S.

7

According to Keeney, the other, who ran to an apartment, was not Izzy Alvarez. The apartment that male ran to was occupied by a family of middle eastern descent.

A.P. testified that, at some point after the shooting, she drove back to the Four Corners area to drop defendant and Epps off. They returned to the apartment complex. Kenneth testified that, when he saw A.P. again at approximately 2:00 a.m. in the parking lot at the Cottonwood Street address, he passed the object N.S. had left with him to her as she sat in a black car. A.P. did not recall Kenneth leaving a bundle with anyone in her car. Shown a video that appeared to show Kenneth approaching the front passenger-side window of her car with something in his hand at approximately 2:00 a.m., A.P. testified she did not recall the incident. She did not know what Kenneth put in her car. She did testify that defendant was seated in the front passenger seat at that time.

A.P. testified she knew defendant to carry guns, and she had seen him with a shotgun before.

Moore testified that N.S. described the shooting to him approximately 20 minutes after Moore arrived at the scene. N.S. told Moore he had been sitting in the passenger seat of A.B.'s Mustang and A.B. was in the driver's seat. They were parked on Community Lane facing north. A car driving southbound stopped and a man got out of the front passenger seat. As he approached the Mustang, the man moved his hands from behind his back revealing that he was holding a sawed-off shotgun. The man shot down into the driver's side of the Mustang, shooting A.B. When he fired, the shooter yelled, " 'Fucking scraps.' "

Yolo County Sheriff's Deputy Dana Simpson testified she interviewed N.S. four times over the course of this case. On the first occasion, N.S. was "very anxious, hyper, excited. He seemed agitated. He was sweating profusely. He just seemed very anxious." Simpson was aware N.S. was a methamphetamine user.

N.S. described the shooter as wearing a hoodie with the hood up so that only the shooter's eyes were visible. Based on this, he thought the shooter was Izzy Alvarez.

8

According to Simpson, on the day of the shooting and in interviews on August 19, October 25, and November 29, N.S. maintained Alvarez was the shooter. Simpson testified that N.S. said the shooter got back into the front passenger side of the vehicle. Asked whether Simpson or her team followed up on that lead, Simpson testified they did, and further testified: "It was concluded that Izzy Alvarez was not in the area at the time of the homicide." Simpson viewed surveillance video from the apartment complex on West Cross Street. She testified that Izzy Alvarez was not in the video.

In July 2017, more than a year after the shooting, a tip came in from someone's attorney indicating defendant made admissions that he was involved.

E.S. testified he had hung around with Norteño criminal street gang members beginning when he was 15.[8] Specifically, E.S. hung around with VBN members. E.S. testified that the Four Corners in the Cottonwood area was where they would hang out. E.S. testified defendant became a VBN member after E.S. met him.

E.S. testified he talked to defendant about the shooting death of A.B. Defendant told E.S. he "had a family incident and he was going through it, and . . . he said that it was karma for killing" A.B. Defendant told E.S. that Jose Epps was with defendant when defendant killed A.B. E.S. testified he had previously seen the shotgun that was used to shoot A.B. E.S. also observed a cut under defendant's eye. Defendant told him that he had held the shotgun "like a sniper," and the shotgun had kicked back into his face.

With regard to a rumor that Izzy Alvarez was involved in the shooting, defendant told E.S. that he "couldn't care, let him take the fall for it." E.S. testified Alvarez told

---

[8] E.S. was in custody for two attempted murders at the time of his testimony. He made an agreement with the prosecution that, in exchange for his testimony, he would enter a plea on an unrelated matter to assault by means of force with a firearm and a gang enhancement and be sentenced to four years in prison. He acknowledged on cross-examination that, if he had gone to trial and been convicted, he could have spent his life in prison.

him he was the one who killed A.B., but a few months later, Alvarez told him he was not the shooter.

Deputy Simpson and Detective Gonzales both reviewed surveillance video. Gonzales testified he reviewed surveillance video from the address on Cottonwood Street that corroborated the tip he received – the same video in which A.P. identified herself and defendant. On the video, at approximately 12:38 a.m. on June 29, 2016, a female got into the driver's seat of a car, defendant got into the front passenger seat, Epps got into the rear passenger seat, and the car backed out. This was approximately one and a half to three minutes prior to the shooting. Gonzales eventually discovered the female driver was A.P. Gonzales also testified that he drove the route from where A.P.'s car was seen at 12:38 a.m. to where A.B. was shot. Driving the route twice, it took one minute 45 seconds and one minute 51 seconds.

Gonzales went to Texas, where A.P. had moved after the shooting, to interview her. During that interview, A.P. identified defendant as one of the people who had been in her car at the time of the shooting. A.P. told Gonzales that, as she was driving, the guys in the car told her to stop because they were going to "check this person." Gonzales testified that "[h]ood checking" is "confronting somebody to see where they're from. Confronting somebody they know to be not from that area, and it is basically confrontation that arises." A.P. told Gonzales that, after the guys got out of the car, A.P. heard a sound like the cocking of a shotgun, and then a boom. The two guys then got back in the car. A.P. observed defendant had a bleeding cut under his eye. She thought defendant got hit in the face when he held up the shotgun. A.P. expressed remorse, felt responsible, and told Gonzales, "it was just suppose to scare them. It wasn't suppose to kill the dude. It was suppose to scare him, shots in the air . . . ."

Detective Keeney contacted defendant as he left his apartment complex, defendant fled, and Keeney lost sight of him. Following his eventual arrest, Gonzales informed

defendant he was under arrest for murder and attempted murder. Defendant responded, "Is that it."

A.P. testified that, at some point, defendant had apologized to her for what happened that night. He told her he was "sorry, to put [A.P.] through that and just put it past us." A.P. acknowledged writing letters to defendant. In one letter, A.P. wrote, "don't do the crime, if you can't do the time." She also wrote, "what's done is done, Kiki, now we must right our wrongs." Additionally, she wrote, "I hope you look at yourself in the mirror and change that person you think you see. I must right my wrongs."

Deputy Simpson testified that the area of West Cross Street and Community Lane was a Norteño area. According to Simpson, when law enforcement "r[a]n" A.B., he was reported as a validated Sureño by the Davis Police Department.

The pathologist who performed the autopsy on A.B. observed a shotgun wound to his mid back, "partially, on to the side, on the left," which was the cause of A.B.'s death. The pathologist noted he did not observe any injuries to A.B.'s neck and observed no signs of strangulation.

Officer Sergio Pimentel of the Yolo County Probation Department had previously supervised defendant on adult probation. During searches of defendant's residence, Pimentel found gang paraphernalia including red bandanas, papers with rap lyrics, and graffiti. Pimentel testified that he had a number of contacts with defendant when defendant was in the presence of other gang members. Pimentel was also involved in cell phone extractions on defendant's cell phone. In one video from the phone, defendant shot a shotgun, yelled "Bosque scrapas"[9] and made a "B" hand sign. Pimentel testified that the word "Bosque" references a Norteño gang in Woodland and the word "scrapas"

---

[9] Defendant objected to the admission of this video as discussed in part I. of the Discussion, *post*.

11

is a derogatory term for Sureño gang members. Pimentel also did a cell phone extraction on someone else's cell phone. There were several photos in which defendant was making a "B" hand sign. In some of the photos, there were other individuals with defendant who were also throwing hand signs, including the number four and the numbers one and four, which represent the fourteenth letter of the alphabet, N, for "Norte."

Detective Gonzales qualified as an expert in criminal street gangs. Woodland in general was VBN territory and VBN was the only significant Norteño criminal street gang in the Woodland area. The Four Corners area is a Norteño neighborhood. VBN had no fewer than 20 members, though the number fluctuated. VBN identified with traditional Norteño symbols such as the number 14, the Huelga bird, and the north star. VBN also adopted the Boston Red Sox "B" which appears in tattoos and graffiti. As for hand signs, VBN members will throw up "the one, four" and the letter N. They will also throw up a lower case b and an upper case B. VBN's rival was the East Side Trece gang, a Sureño subset.

Defendant had a "530" tattoo on his wrist, which is the area code for Yolo County. The "3" had lines crossing it out, which, according to Gonzales, was a sign of disrespect to Sureños. Sureños identify with the number 13 because M, standing for Mexican Mafia, is the 13th letter of the alphabet. So, like Norteños identify with the number four, Sureños identify with the number three. Defendant also had a tattoo of a "money sign," but the "S" was crossed out, another sign of disrespect to Sureños. Defendant also had a California bear tattoo which, according to Gonzales, was also a Norteño symbol. Defendant had "WDLD," for Woodland, tattooed on his left fingers. And he had "4 CB" tattooed on his ring finger, a symbol used by "people that are either from that neighborhood or claim that neighborhood as their own." Gonzales added, "you can tell those, all those tattoos are either representing where [defendant] is from and who he is as a Norteno."

12

Based on the tattoos, Gonzales's contacts and investigations involving defendant, defendant's writings (discussed in part I. of the Discussion, *post*), social media, defendant's actions in this case, and Gonzales's background knowledge, Gonzales opined defendant was a member and an active participant in VBN.

Gonzales also testified A.B. was a validated Sureño gang member "at one time with Davis Police Department." A.B. associated with East Side Trece in Woodland.

Gonzales testified about the importance of respect in gang culture and that, in gang culture, respect is synonymous with fear and intimidation.

Gonzales testified that, if a Sureño was seen wearing bright blue in a known VBN neighborhood, such as the Four Corners area of Woodland, a VBN member would be expected to "represent his neighborhood" in a way that "usually turns out to be violent."

Gonzales testified concerning predicate offenses committed by VBN gang members. In one predicate offense, Marcus Wease attempted to run over an individual believed to be a Sureño gang member. He was convicted of assault by means of force likely to cause great bodily injury and gang enhancements. In another predicate offense, a group of VBN members and associates drove through a Sureño neighborhood in Woodland, got out, and jumped a perceived Sureño gang member, stabbing him several times. The incident resulted in convictions of "245, assault with weapon, aiding assault with weapon, and 186.22, gang enhancement."

The parties stipulated that members of VBN "have engaged in a pattern of criminal gang activity, specifically the commission of, attempted commission of, conspiracy to commit, conviction of, and any combination of two or more of the following crimes: [¶] Murder, attempted murder, assault with a deadly weapon, and assault by means of force likely to produce great bodily injury; [¶] And that at least one of those crimes was committed after September 26, 1988; [¶] And that the most recent crime occurred within three years of the earlier crime; [¶] And that the crimes were

13

committed on separate occasions or were personally committed by two or more persons." There was no stipulation as to the primary activities of VBN.

## Defense Evidence

Anna Stowe, a defense investigator, interviewed Elizabeth. Elizabeth told Stowe that, on the night of the shooting, she was inside an apartment when she heard a loud boom. She ran outside, saw A.B.'s car had crashed, and saw N.S. standing outside the driver's door with his hands around A.B.'s neck. Elizabeth tried to perform CPR on A.B. A.B. turned to Elizabeth, mouthed something she did not understand, and then died. N.S., meanwhile, was searching frantically for something between the seat and the driver's door. Elizabeth saw N.S. retrieve a gun and wrap it in something. N.S. told Elizabeth that "it was Izzy," and that he saw Izzy's belt buckle.

Jody testified N.S. had been staying with her off and on. Jody testified that, at the time of the shooting, A.B. had been dating Kim T. Prior to the shooting, Kim and N.S. came to Jody's apartment together, went into the back room, and did not come out for a while. Jody heard sexual noises coming from the back room. Jody texted A.B. and told him what she had heard.

After the shooting, according to Jody, N.S. was agitated, jumpy, explosive, and unlike himself. He took Jody's phone and would not give it back to her. Jody asked N.S. if he killed A.B., and N.S. "exploded on" her. Jody testified that, at some point after the shooting, she saw N.S. washing blood out of his white shorts and white shirt.

When called by the defense, A.P. testified defendant was right next to her when he got out of her car immediately prior to the shooting and she never saw him with a shotgun in his hands that night. She also testified he did not have a gun in his hands when he reentered the car. A.P. also testified she observed a cut to defendant's nose, not under his eye.

Defendant's stepfather remembered noticing a cut or mark on defendant's face one day before the date of the murder. Defendant and his stepfather worked for the same

14

company and drove to and from work together. One morning, they were driving to work at 5:30 and defendant's stepfather did not notice anything unusual on defendant's face. Toward the end of the workday, defendant and his stepfather got together to clock out and defendant's stepfather noticed a cut on the left side of his nose. This occurred a day or two before defendant's child was born, which may have been on June 29.

### Verdict and Sentencing

The jury found defendant guilty of murder in the first degree (§ 187, count 1) and found true the gang-related murder special circumstance allegation (§ 190.2, subd. (a)(22)). The jury further found true the criminal street gang enhancement allegation (§ 186.22, subd. (b)(1)) and the allegation that defendant personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). The jury also found true the enhancement allegation that a firearm was discharged by a principal in a murder committed at the direction of, for the benefit of, or in association with a criminal street gang causing great bodily injury or death. (§ 12022.53, subds. (d), (e)(1).) The jury found defendant not guilty of attempted murder (§§ 664, 187, count 2), which related to N.S. as the alleged victim. The jury found defendant guilty of possession of a firearm by a prohibited person (§ 29815, subd. (a), count 3), and found true the attached gang enhancement allegation (§ 186.22, subd. (b)(1)). The jury also found defendant guilty of carrying a loaded firearm while an active participant in a criminal street gang (§ 25850, subds. (a), (c)(3), count 4), and active participation in a criminal street gang (§ 186.22, subd. (a), count 5).

The trial court sentenced defendant to a determinate term of seven years consecutive to life without the possibility of parole, calculated as follows: the upper term of three years on count 3, possession of a firearm by a prohibited person plus four years on the attached section 186.22, subdivision (b)(1) enhancement consecutive to life without the possibility of parole on count 1, murder in the first degree and the gang related murder special circumstance (§ 190.2, subd. (a)(22)). Pursuant to section 654, the

15

court stayed the 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)), the 25-to-life term for the personal discharge of a firearm causing great bodily injury or death enhancement (§ 12022.53, subd. (d)), and the 25-to-life term for the enhancement where a principal to a violation of section 186.22, subdivision (b) discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), all attached to count 1.  The court also stayed, pursuant to section 654, the upper terms of three years each on counts 4 and 5, the substantive gang crime charges.

## DISCUSSION

### I.  Gang Evidence

#### A.  Additional Background

##### 1.  Evidence Code Section 402 Hearing

Prior to trial, the trial court held an Evidence Code section 402 hearing on the admissibility of certain testimony to be offered by Detective Gonzales.  The subject of the hearing was items Gonzales located during a search at defendant's residence on February 19, 2017, approximately eight months after the murder.  He found a 12 gauge shotgun, ammunition, two cell phones, and "a couple notebooks that had a lot of gang writing in it."  At the hearing, Gonzales read five passages from pages in defendant's notebooks.[10]

Gonzales testified law enforcement had obtained similar gang writings in a prior probation search of defendant's room.  Those prior writings were highly similar to the writings Gonzales read in the Evidence Code section 402 hearing.  They "depicted [defendant's] gang affiliation, he talked about killing or shooting scraps or Surenos, snitches, his affiliation with the neighborhood of Four-Corners block, and his Norteno affiliation."

---

[10]  We set forth the contents of four of the five writings *post*.

Defense counsel objected to this evidence as cumulative and prejudicial. He also asserted the evidence was merely rap lyrics and did not prove defendant intended to kill anyone. Defense counsel further asserted that a passage that referred to defendant in trouble when he was 12 years old "has all sorts of prejudicial overtones and would be cumulative to any message that the District Attorney wanted to get about intent." Defense counsel asserted that, even if some of the writings had probative value, others did not. According to defense counsel, a limiting or cautionary instruction could not overcome the prejudicial effect of this evidence. Defense counsel requested that all five exhibits be excluded.

The prosecutor emphasized defendant was charged with, among other things, willful premeditated murder and gang offenses and asserted a defendant's statements of intent are always relevant. The statements were also relevant to show defendant's gang membership and animosity towards Sureños. Thus, according to the prosecutor, the evidence was relevant to defendant's gang membership and specific intent to kill.

The trial court found all five exhibits "very relevant, very probative," and not cumulative. The court continued: "Though one that I had a little concern about was, (Reading) 'Only 18, but I been through a lot, 12 years old got involved with the law, doing dirt, putting work in-N-out of the hall,' and I had a little concern about that, but it doesn't say what he did, whether he was, I mean, there is nothing there other than what is very probative to me is that he's been putting in work since he was 12 years old. [¶] And so any prejudicial value is clearly outweighed by the absolute probative value of that. [¶] So, I don't see any reason why all five of these wouldn't come in. [¶] So I would allow them all to come in."

### 2. Video Evidence

Defense counsel objected to the prosecution's proposed use of the video recording of defendant "shooting a shotgun and indicating derogatory terms at the same time about Southerners." He asserted that, "if any piece of evidence in this case is excludable under

17

[Evidence Code section] 352, it's this because they're already allowed to show his mistrust of Southerners and his willingness, at least in writing, to kill. This is highly prejudicial."

The prosecution characterized the video as showing defendant "firing a shotgun, turning to the camera, making a gang sign, and yelling, 'Bosque scrapas.' " According to the prosecution, the video was relevant to rebut an anticipated defense that, based on matters such as the rap lyrics, defendant "talks the talk but doesn't walk the walk." The video would show otherwise.

The trial court concluded that the video's probative value was not outweighed by its prejudicial effect.

### 3. Trial Testimony

Probation Officer Pimentel testified about rap lyrics he found in a search of defendant's residence on February 11, 2016, five months before the murder.[11] He read the lyrics: "You know what I bang WDL is that northside gang, middle finger to those suckaz that couldn't hang. DO'z and snitches that couldn't maintain. Fuck them all. [¶] I'm in here holding it down behind the walls. Loyalty above all laws. Push, pull, strivin for the cause. Do it for my gente, see a fucken scrap. We gonna smoke em with a quete. Uno ocho siete. [¶] Fuck East Side Trece. Homicide in my head. [¶] So I'll leave a scrap dead. I'll fill you up with led, if you talking to the feds. I bang 14. So I'm always wearing red. [¶] If you're D.O. or snitch you gotta beam on your head. [¶] You finna end up soaked in red." Pimentel testified a "D.O." is a dropout, someone who no longer associates with a gang. A "scrap" is a derogatory term for a Sureño gang member. Uno ocho siete, or 187, is the Penal Code section for murder. East Side Trece is a Sureño subset in Woodland. "Quete" typically refers to a gun or firearm.

---

[11] We set forth the testimony of Pimentel and Gonzales reading these writings as they appear in the reporter's transcript with no correction or notation of errors in the original.

Detective Gonzales testified he had participated in a search of defendant's residence as part of the murder investigation. He located notebooks containing rap lyrics, gang clothing, cell phones containing photographs of defendant "and his gang affiliation," and a shotgun. He read to the jury passages from the notebooks that were the subject of the Evidence Code section 402 hearing.

Gonzales read People's exhibit 71: "I'm from Woodlone. Northern Cali4nia, 4CB, is that 4 Corners block, 1-4 West side, chasing down you scraps till the day I die. [¶] Nortenos put it down in my town, scraps ain't shit. They get knocked to the ground. [¶] So let me tell you like this, yo soy EL Woodlonero, Norteno con filero, stick u in the gut if u don't give me your dinero, Norte gang bang all day every day. Snitches get sprayed for the shit that they say, don't be a rata or bitchass scrapa. [¶] (Witness spoke in Spanish) don't let me catch you slippin cuz we really out here shootin. B-town representin that Northern Cali movement." Gonzales testified "rata" is a rat, and scrapa is a derogatory word for Sureño.

Gonzales next read People's exhibit 72: "Ever since a youngsta I loved the streets. Kicking with homies and looking up to OG'z. I didn't choose this life. I was meant to be raised on the block, representing 4 CB. [¶] Now, look at me, running from the police, sippin on daily and smoking them trees. Westside Woodlone is the place I call home. Day by day, living in the 5-3-0, can't stop, won't stop, I bang that 1-4 throw up my hood, let these suckas know, fuck a scrap and 5-0." Gonzales testified "5-0" referred to the police.

Gonzales then read from People's exhibit 73: "Kiki be the name. If you suckas haven't heard, homicide on my mind don't get yourself murcked. [¶] Kiki be the name if you suckas haven't heard, trigger happy bitch don't get yourself murcked. Any kind of disrespect and I'll hit em where it hurts, Varrio Bosque, be the gang bitch we get turned." Gonzales testified that "murcked" was a slang term for murdered.

19

Gonzales read from People's exhibit 74: "Only 18 but I been through a lot. 12 years old got involved with the law doing dirt, putting work in-N-out the hall. [¶] Momma pray to God she don't wanna see me fall, every day struggle. So I gotta stand tall, death before dishonor, loyalty above all laws. I do it for the MOB. I do it for the cause, I do it for the homies locked behind the walls, I do it -- it for the MOB, I do it for the cause, I do it for the homies locked behind the walls."

Gonzales testified that, in gang subculture, "you have your reputation, your identity that you try to build. You're trying to promote yourself, while those lyrics can be a promotion of yourself, if you talk the talk, you don't walk the walk, that will be seen and you will be viewed as weak within that gang, and so, in essence, a gang member has expectation to, if you're going to say something, if you're going to write something or preach something, then you got to follow it up with action."

Gonzales testified that such writings were "a clear sign that [defendant] is an active gang member in that gang."

## B. Defendant's Contentions

Defendant asserts the trial court abused its discretion by admitting cumulative, highly prejudicial gang evidence. The focus of defendant's contention is the evidence in the form of the writings found in searches of his residence, the video showing him shooting a firearm and yelling "Bosque scrapas," photos extracted from cell phones showing defendant and others throwing gang signs, and testimony concerning defendant's gang tattoos. Defendant points out the potential for prejudice with such evidence and asserts that admission of gang evidence "has been condemned where it is only tangentially relevant to the charged offenses." Defendant asserts that, as was the case in *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), here, "the prosecution was allowed to present excessive, cumulative and inflammatory gang evidence against" defendant. Defendant concedes there was "some probative value to a limited amount of" this evidence. He does not identify what specific evidence, or what

20

portion of it, had probative value. Instead, he characterizes the evidence as "excessive and irrelevant gang evidence," and asserts that the probative value was "substantially outweighed by the probability, indeed reality, that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." According to defendant, the jury "could only have used [the gang evidence] to infer that, regardless of guilt or innocence, . . . [defendant] was a violent gang member associated with the Norteno gang who was criminally disposed and was a danger to society in general and therefor [*sic*] found him guilty of murder and all other charges."[12] Further, defendant asserts that, given the nature and volume of this prejudicial gang evidence, and the role it played in his prosecution, the error in admitting the evidence constituted a due process violation rendering his trial fundamentally unfair, and the Attorney General cannot establish that the trial court's error was harmless beyond a reasonable doubt.

### C. Forfeiture

The Attorney General asserts defendant forfeited a number of his claims of error. The Attorney General notes that, while defendant objected to the admission of the writings and cell phone video of him discharging a shotgun on Evidence Code section 352 grounds, he did not object to the other gang evidence. Accordingly, the Attorney General asserts defendant forfeited his contentions as related to the photos extracted from a cell phone, testimony about defendant's tattoos, and defendant's possession of a shotgun by failing to object to the admission of these items of evidence. The Attorney General also asserts defendant forfeited his due process claim, as he did not raise it in the trial court.

Evidence Code section 353 provides, in pertinent part: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason

---

[12] Notwithstanding defendant's characterization of being convicted on the murder and "all other charges," the jury acquitted him on count two, attempted murder.

21

of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."  Thus, a " ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433 (*Partida*).)  " 'The reason for the requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Id*. at p. 434.)

We agree with the Attorney General.  Defendant did not object to the admission of the photos extracted from a cell phone, testimony about defendant's tattoos, or defendant's possession of a shotgun.  Having failed to make objections in the trial court, defendant forfeited any contentions related to the admission of this evidence.  (Evid. Code, § 353; *Partida, supra*, 37 Cal.4th at p. 433.)  Accordingly, we address only defendant's preserved contentions concerning the writings from defendant's notebooks and the video depicting defendant firing a shotgun and yelling "Bosque scrapas."

### D.  Relevance and Evidence Code Section 352

"No evidence is admissible except relevant evidence."  (Evid. Code, § 350.) " 'Relevant evidence' means evidence, . . . having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210, italics added.)

Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

22

"Evidence is not inadmissible under [Evidence Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in [Evidence Code] section 352. [Citations.] [¶] Trial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value. [Citations.] A trial court's exercise of discretion 'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 167-168 (*Holford*); see also *People v. Ledesma* (2006) 39 Cal.4th 641, 701 [we review the trial court's ruling admitting evidence over a defendants' Evid. Code, § 352 objection for abuse of discretion].)

## E. Analysis

Defendant was charged with murder, a gang related murder special circumstance, two substantive gang crimes and gang enhancements. As the Attorney General states, "gang evidence was an integral and necessary part of the case against" defendant.

Given the special circumstance, substantive gang crime charges, and the enhancement allegations, it is beyond dispute defendant's VBN gang membership and active participation in the gang were relevant at trial. Indeed, the prosecution bore the burden of proving defendant's active gang participation for the special circumstance and substantive gang crime charges. To establish active participation, the prosecution had to prove defendant's participation was "more than nominal or passive." (*People v. Albillar* (2010) 51 Cal.4th 47, 56 (*Albillar*).)

In addition to the elements of the gang related murder special circumstance, the substantive gang crime charges, and the gang enhancement, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory,

23

membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect." (*People v. Williams* (1997) 16 Cal.4th 153, 193.)

The lyrics or writings in defendant's notebooks were relevant to prove motive and intent. Defendant's own words demonstrated: his loyalty to the gang "above all laws"; his hatred for Sureño gang members, whom he referred to as "scrap[s]"; his motive to "smoke em with a quete. Uno ocho siete," which, according to Pimentel, means a gun or firearm and Penal Code section 187; that he had "[h]omicide in [his] head" and would "leave a scrap dead"; that he would "chas[e] down you scraps till the day I die" and that "scraps ain't shit. They get knocked to the ground"; his warning, "don't let me catch you slippin cuz we really out here shootin"; his declaration, "homicide on my mind, don't get yourself murcked," which, according to Gonzales, was a slang term for murdered; and his warning that, "[a]ny kind of disrespect and I'll hit em where it hurts."

A.B. was in Norteño gang territory when defendant murdered him. A.B. was previously validated by the Davis Police Department as a Sureño gang member. When defendant shot A.B. with a shotgun, he exclaimed, " 'Fucking scraps.' " Thus, the writings provided evidence of defendant's motive and intent in shooting and killing A.B. and were highly relevant.

The writings were also relevant to his membership and active participation in a criminal street gang. As noted, active participation means that defendant's participation was more than nominal or passive. The statements referenced immediately above certainly establish that as do the following statements: "You know what I bang WDL is that northside gang, middle finger to those suckaz that couldn't hang. [¶] . . . [¶] Loyalty above all laws. Push, pull, strivin for the cause"; "I gotta stand tall, death before

24

dishonor, loyalty above all laws. I do it for the MOB. I do it for the cause, I do it for the homies locked behind the walls, I do it -- it for the MOB, I do it for the cause, I do it for the homies locked behind the walls"; "can't stop, won't stop, I bang that 1-4 throw up my hood"; and "Only 18 but I been through a lot. 12 years old got involved with the law doing dirt, putting work in-N-out the hall."

Additionally, much of this evidence was relevant to prove the primary activities of the VBN gang, which was not included as part of the parties' stipulation. As we discuss in more detail *post*, Gonzales testified that the primary activities of VBN included murder, aggravated assault and prohibited possession of firearms. A primary activity is a chief or principal activity rather than the occasional act committed by one or more members of the gang. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Defendant's lyrics or writings were about one of his gang's primary activities—assaulting and killing Sureños.

As for the video, it showed defendant firing a firearm and yelling "Bosque scrapas." This was relevant to defendant's knowing possession, use, and knowledge of firearms, his membership and active participation in VBN, and his intent and motive as pertaining to "scraps" or Sureño gang members such as his victim, A.B. His possession of the shotgun was also relevant as an example of one of the primary activities of his gang, prohibited possession of firearms. Thus, the video was also relevant and highly probative of central issues at trial.

The substance of defendant's contention on appeal is that this evidence was cumulative and inflammatory, and that the probative value of the evidence was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) In support of this argument, defendant misplaces reliance on *Albarran, supra*, 149 Cal.App.4th 214, a case clearly distinguishable from the instant case.

25

In *Albarran*, the defendant was found guilty of attempted murder, shooting at an inhabited dwelling, and attempted kidnapping for carjacking, and the jury returned true findings on gang enhancement allegations attached to these counts. (*Albarran, supra*, 149 Cal.App.4th at p. 217.) Prior to trial, the defendant had sought to exclude gang evidence, arguing it was irrelevant to the charges and inadmissible pursuant to Evidence Code section 352. (*Albarran*, at p. 217.) The trial court allowed the evidence. (*Ibid.*) After the jury rendered its verdict, the defendant filed a new trial motion, asserting there was insufficient evidence to support the gang enhancement allegations and that admission of irrelevant and prejudicial gang evidence warranted a new trial on all charges. (*Ibid.*) The trial court found the evidence supporting the gang enhancement allegations was insufficient, granted the new trial motion as to those allegations only, and denied the new trial motion as to the underlying charges, finding the gang evidence was relevant to intent. (*Ibid.*)

On appeal, the defendant asserted, among other things, that "having found the gang evidence was insufficient to prove the gang allegations, [the trial court] should have also concluded the gang evidence was irrelevant and unduly prejudicial as to the underlying charges, and thus, the court should have granted his new trial motion in its entirety." (*Albarran, supra*, 149 Cal.App.4th at pp. 222-223.) On review, the *Albarran* court noted that the trial court held the view that at least some of the gang evidence was relevant and admissible to prove motive or intent for the underlying crimes, "irrespective of the fact that the gang evidence was not sufficient to prove the gang allegations." (*Id.* at p. 226.)

At trial, the prosecution had argued that the motive for the shooting at issue was gang-related. (*Albarran, supra*, 149 Cal.App.4th at p. 227.) However, the *Albarran* court concluded "there was insufficient evidence to support the contention that this shooting was done with the intent to gain respect" within the gang as the gang expert testified. (*Ibid.*) The court stated that "the motive for the underlying crimes, in particular

26

the shooting . . . , was not apparent from the circumstances of the crime," and that there was "nothing inherent in the facts of the shooting to suggest any specific gang motive." (*Ibid*.)

The *Albarran* court further concluded that, even if evidence of the defendant's gang membership and some evidence of gang behavior was relevant to motive and intent, "other extremely inflammatory gang evidence was admitted, which had no connection to these crimes." (*Albarran, supra*, 149 Cal.App.4th at p. 227.)  The *Albarran* court held that all of the evidence "was irrelevant to the underlying charges and obviously prejudicial" and "approached being classified as overkill." (*Id*. at p. 228.)  The amount and nature of the gang evidence in *Albarran* is in stark contrast to the highly probative evidence admitted here.

In *Albarran*, the gang expert testified "at length" about the identities of other members of the gang, the wide variety of crimes they had committed and the numerous contacts between the various gang members, other than the defendant, and the police. (*Albarran, supra*, 149 Cal.App.4th at p. 227.) He described a specific threat the gang made in graffiti to kill police officers.  (*Id*. at p. 228.)  The police were not victims in the charged offenses; the case involved a shooting at a house party.  (*Id*. at p. 217.)  Also, the jury heard unnecessary references to the Mexican Mafia.  (*Id*. at p. 228.)  The *Albarran* court concluded, "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia had little or no bearing on any other material issue relating to Albarran's guilt on the charged crimes and approached being classified as overkill." (*Ibid*.)  The court concluded this evidence "was so extraordinarily prejudicial and of such little relevance that it raised the distinct potential to sway the jury to convict regardless of Albarran's actual guilt." (*Ibid*.)

The circumstances here are quite different.  In *Albarran*, the trial court found insufficient evidence to establish the gang enhancement, thus taking the elements related to the gang enhancement off of the probative-value side of the balance in the section 352

27

analysis.  Here, unlike in *Albarran*, the gang related murder special circumstance, substantive gang charges, and the gang enhancement allegations, and the elements thereof, remained in issue.  Thus, we are not presented with the question of whether the gang evidence was cumulative or prejudicial in relation solely to a charge of first degree murder.  Instead, we consider defendant's contentions in the context of the elements of the gang-related special circumstance, the substantive gang crime charges, and the gang enhancement allegations in addition to motive and intent related to the commission of the murder.  Moreover, unlike *Albarran*, the evidence here clearly established that the underlying murder was gang-motivated and no evidence that comes anywhere close to the irrelevant "overkill" evidence admitted in *Albarran* was admitted.

We conclude that the evidence in the form of the excerpts from defendant's notebooks and the video were neither cumulative nor particularly inflammatory.  Certainly, some of the lyrics in defendant's notebooks covered similar ground.  However, we do not conclude that they rose to the level of problematically cumulative, especially in light of the need to establish the elements of active participation and primary activities, which suggest the jury must make both a qualitative and quantitative assessment of the activities of a defendant and his gang.  Given the nature of these elements, the shear amount of evidence strengthens its probative value because it establishes the intensity of defendant's participation and motive as well as the principal nature of VBN's activities.  As for the video, in addition to establishing active participation and primary activities, it was among the only evidence presented relevant to defendant's knowledge of firearms and how to fire them.

Moreover, the subject evidence also was not particularly inflammatory.  Indeed, this evidence paled in comparison to defendant essentially ambushing the victim, shooting him in the back at close range with a shotgun, killing him.  In any event, " ' "[t]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from

28

relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " (*Holford, supra*, 203 Cal.App.4th at p. 167, quoting *People v. Escudero* (2010) 183 Cal.App.4th 302, 312; accord *People v. Karis* (1988) 46 Cal.3d 612, 638.) As we have reasoned, the evidence here was highly probative of the elements of the gang-related murder special circumstance, the substantive gang crime charges, and the gang enhancements, as well as intent and motive for commission of the murder.

The trial court did not abuse its discretion in determining the probative value of this evidence was not substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. As for the potential of confusing the issues or misleading the jury, defendant has not offered any analysis as to these claims. (Evid. Code, § 352.) Nor do we readily find any support for this premise reflected in the record. In fact, rather than confuse the issues or mislead the jury, this evidence was likely to legitimately contribute to the jury's resolution of the issues it had to decide. We conclude that, in admitting this evidence over defendant's Evidence Code section 352 objection, the trial court did not exercise its discretion " 'in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Holford, supra*, 203 Cal.App.4th at pp. 167-168.)

As for defendant's contention that "the erroneous admission of gang evidence" rose to the level of a due process violation, to the extent his argument is "that due process required exclusion of the evidence for reasons other than those articulated in his Evidence Code section 352 argument," the argument is forfeited and he may not raise it on appeal. (*Partida, supra*, 37 Cal.4th at pp. 435, 436.) While defendant may argue, for the first time on appeal, that "the asserted error in admitting the evidence over his Evidence Code

29

section 352 objection had the additional legal consequence of violating due process," (*Partida*, at p. 435) we have found no error in the trial court's overruling of defendant's Evidence Code section 352 objection. In addition, we conclude defendant's claim that the trial court's error in admitting the evidence had the additional legal consequence of violating due process is meritless.

## II. Substantial Evidence of VBN's Primary Activities

### A. Additional Background

During his testimony, the prosecutor and Gonzales had the following exchange about VBN's primary activities:

"Q    Now, do you have an opinion or, in your opinion, what are the primary activities of VBN?

"A    Primary activities are murder, attempted murder, assault with a deadly weapon, illegal drug sales, prohibited possession of firearms, prohibited sales of firearms. It also trickles over to property crimes, like burglaries and vandalism."

Asked what he based his opinion on, Gonzales responded, "From the crimes that I've investigated since being in the gang unit, as well as when I was on patrol, and just historical review on the many crimes that have been associated to Varrio Bosque Nortenos."

### B. Defendant's Contentions

Defendant asserts the gang-related murder special circumstance, the substantive gang crime charges and the gang enhancements were not supported by substantial evidence because there was insufficient evidence establishing that VBN's primary activities include the commission of one or more statutorily enumerated offenses. He maintains there was no evidence that the "primary activities" recited by Gonzales were "one of VBN's chief or principal activities rather than an occasional act committed by one or more of VBN members." Defendant further maintains that this testimony "fails to

30

establish that the stated crimes are committed by members of VBN.  The [expert's] 'opinion' merely states that the crimes were committed by individuals 'associated' with VBN."[13]  The contention is meritless.

## C.  Standard of Review

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or special circumstance beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses.  [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)  In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)  The same standard applies in reviewing a challenge to the sufficiency of the evidence to support an enhancement.  (See *Albillar, supra*, 51 Cal.4th at pp. 59-60.)

---

[13]  As noted, Gonzales actually testified about "crimes that have been associated to Varrio Bosque Norteños."  He did not testify the crimes were committed by individuals who were merely associated with VBN.

## D. Analysis

To establish that a group is a criminal street gang, the prosecution must prove that: (1) it is an "ongoing organization, association, or group of three or more persons, whether formal or informal, . . . having a common name or common identifying sign or symbol"; (2) *one of the group's primary activities is the commission of one or more statutorily enumerated criminal acts*; and (3) the group's "members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f); *People v. Prunty* (2015) 62 Cal.4th 59, 71 (*Prunty*), italics added.) Defendant only challenges the sufficiency of the evidence to prove the "primary activities" element.

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*Sengpadychith, supra,* 26 Cal.4th at p. 323.) "Proof that a gang's members consistently and repeatedly have committed criminal activity listed in section 186.22, subdivision (e) is sufficient to establish the gang's primary activities. On the other hand, proof of only the occasional commission of crimes by the gang's members is insufficient." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1464-1465.) Expert testimony that gang members are " 'often' " committing certain acts has been held sufficient to support the jury's finding that a gang's primary activities were among the statutorily enumerated criminal offenses. (*Id.* at p. 1465.)

"[B]ecause the culture and habits of gangs are matters which are 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact' [citation], opinion testimony from a gang expert, subject to the limitations applicable to expert testimony generally, is proper. [Citation.] Such an expert—like other experts— may give opinion testimony that is based upon hearsay, including conversations with gang members as well as with the defendant. [Citation.] Such opinions may also be

based upon the expert's personal investigation of past crimes by gang members and information about gangs learned from the expert's colleagues or from other law enforcement agencies." (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1223, fn. 9.)

The charged offenses include murder, one of what Gonzales testified were VBN's primary activities. The trier of fact may consider "the circumstances of the *present* or charged offense in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes." (*Sengpadychith, supra*, 26 Cal.4th at p. 323.)

As noted, defendant's writings, too, support the premise that VBN's primary activities included murder, attempted murder, assault with a deadly weapon, and assault by means of force likely to produce great bodily injury. The jury could reasonably infer from defendant's writings that he and his gang engaged in the activities about which he wrote and that he was essentially glorifying his gang's primary activities. Also, as noted, the video showing defendant actually firing a firearm would support such an inference in addition to providing an example of prohibited possession of a firearm, one of VBN's primary activities.

"Sufficient proof of the gang's primary activities *might consist* of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony . . . ." (*Sengpadychith, supra*, 26 Cal.4th at p. 324, italics added.) The trial record, summarized here, is more than sufficient to constitute substantial evidence that VBN "*consistently and repeatedly*" committed activity listed in the gang statute. (*Ibid*, italics added.) Indeed, as illustrated by the instant case, the evidence clearly established that killing and assaulting Sureños is a chief or principal activity of VBN. Such murders and assaults qualify as a primary

33

activity and satisfy that element of the gang-related murder special circumstance, substantive gang crime charges and gang enhancements.[14]

Substantial evidence in the record satisfied the primary activity element as to VBN. (See *Prunty, supra*, 62 Cal.4th at p. 82.) This is certainly not a case where " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added), including its necessary determination as to VBN's primary activities. (*Ibid.*)

### III. Other Evidentiary Rulings

### A. Law Enforcement Testimony Pertaining to Izzy Alvarez

Defendant asserts the trial court abused its discretion in admitting prosecution evidence from Deputy Simpson and Detective Gonzales that Izzy Alvarez was not the shooter.

### 1. Deputy Simpson's Testimony

Deputy Simpson's direct examination included the following questions and answers:

"Q      Did [N.S.] indicate to you that he had knowledge as to one of the participants in this incident?

"A      At the time he believed he did, yes.

"Q      Who did he believe was involved in the incident?

"A      Israel Alvarez known as Izzy.

"Q      Okay. Now, as an investigator, do you or your team follow up on that lead?

---

[14] Defendant's attempt to bolster his contention by highlighting the fact that the prosecutor, in closing argument, did not mention the primary activities element for a gang finding is unavailing. As the Attorney General asserts, defendant's sufficiency of the evidence claim rises or falls based on the evidence. The arguments of counsel are not evidence. (*People v. Saelee* (2018) 28 Cal.App.5th 744, 755, citing *People v. Redd* (2010) 48 Cal.4th 691, 727 & fn. 16, 733, 743 & *People v. Hamilton* (2009) 45 Cal.4th 863, 928-929.)

"A    We did.

"Q    Okay. Did anything pan out from that investigation?

"A    It was concluded that Izzy Alvarez was not in the area at the time of the homicide."

Defendant asserts the court abused its discretion in admitting Simpson's testimony. He asserts this testimony lacked foundation and was based on hearsay.

Defendant did not object to Simpson's testimony that he challenges on appeal. When the prosecutor initially embarked on the line of questioning about N.S. believing he knew the identity of the shooter, defense counsel objected based on the leading nature of the prosecutor's question, an objection which the trial court sustained. Thereafter, the prosecutor rephrased, and the foregoing exchange took place. Defendant did not object.

Because defendant did not object to the admission of the testimony he now challenges on appeal on the grounds he asserts on appeal, he has forfeited his contentions. (Evid. Code, § 353; *Partida, supra*, 37 Cal.4th at p. 433 [failure to make timely and specific objection on the ground asserted on appeal makes that ground not cognizable]; *People v. Eubanks* (2011) 53 Cal.4th 110, 142 [defendant forfeited hearsay objection by failing to raise it at trial]; *People Houston* (2012) 54 Cal.4th 1186, 1213-1214 [lack of foundation objection forfeited by failing to raise it in trial court].)

**2. Detective Gonzales's Testimony**

Gonzales's testimony included the following questions and answers:

"Q.    Now, in this particular case, we've heard some testimony that another individual, Izzy Alvarez, had at some point claimed to -- some credit for the killing of [A.B.].

"How does -- how does the concept of respect reflect on Mr. Alvarez attempting to claim credit for that crime?

35

"A.     So for gang members to earn that respect, they must either walk the walk or talk the talk.  All those -- all those incidents where a gang member will try to brag about something could be an incident -- way to bolster their reputation within the gang.

"The problem with that is --

"[DEFENSE COUNSEL]:  I'll object.  It's nonresponsive.

"THE COURT:      I'll allow it.

"THE WITNESS:    The problem with that is that at a certain point, that reputation can be diminished if that person lies or if that person is just talking.  So to maintain that, you have to show that -- that consistent behavior.

"So in essence, just like rap lyrics or telling a group of your fellow gang members that you've committed something, you have to also show that you walk the walk.

"Q.     BY [THE PROSECUTOR]:  And has Mr. Alvarez done that?

"A.     No.

"Q.     And how does that -- his -- when he --

"[DEFENSE COUNSEL]:  Objection, and move to strike.  It calls for a conclusion.  There's no foundation.

"THE COURT:      Sustained.  Stricken."

According to defendant, the trial court abused its discretion in admitting Gonzales's testimony that Izzy Alvarez, who at one point claimed some credit for killing A.B., had failed to show that he "walk[ed] the walk."  Defendant asserts this testimony lacked foundation and was based on hearsay.  Additionally, defendant asserts that "it was improper for Detective Gonzale[s] to give his opinion as to whether Izzy Alvarez shot [A.B.], whether he walked the walk.  That determination was solely for the trier of fact to determine."

While defendant's contentions as to Simpson's testimony are forfeited, his contentions concerning Gonzales's testimony fail for, in a sense, the opposite reason.  Defendant objected to the challenged testimony at trial, the trial court sustained the

36

objection, and the trial court struck Gonzales's testimony to which defendant objected. Because the trial court sustained the objection and struck the subject testimony, defendant has no error to raise here.

## B. Detective Gonzales's Expert Opinion Testimony

Gonzales also noted E.S.'s testimony that Alvarez took back his claim of being responsible for killing A.B. Asked how this affected Alvarez's standing in the gang, Gonzales testified: "It showed that he was untruthful and that he -- his word could not be trusted. It basically diminished his reputation of whatever incident he was attempting to say that he was a part of it. Just basically for Mr. Alvarez, he loses a lot of the trust within the gang, within the members."

As is commonplace, the prosecutor asked the gang expert a hypothetical question mirroring the facts of the case. This hypothetical immediately followed Gonzales's testimony that "he loses a lot of the trust within the gang, within the members." Transitioning to his hypothetical, the prosecutor then stated, "Now, as for the gang *and the person who did commit the shooting*, let me ask you a hypothetical." (Italics added.) He then posed his hypothetical: "If a member of Varrio Bosque Norteño in the Four Corners-block area was in the Four Corners-block area, and that person shot someone who was a Sureño and that person was with the two other individuals who are active with VBN, do you have an opinion as to whether or not that crime would be done for the benefit of or in association with the criminal street gang?" Gonzales testified the hypothetical individual's actions were undertaken for the benefit of the gang, and further that the individual acted with the specific intent to further, promote, or assist criminal conduct by gang members when he committed the crime.

Defendant asserts Gonzales improperly opined on the facts of the case rather than a hypothetical scenario. He bases this contention on the way the prosecutor prefaced his hypothetical to Gonzales. According to defendant, the "preface was improper as it directly tied the hypothetical to [defendant], the person the People charged as the shooter

in this case," i.e., "the person who did commit the shooting . . ." Defendant further asserts the admission of Gonzales's testimony about whether and how defendant's acts constituted a benefit to the VBN gang constituted reversible error. He does not, however, offer any further analysis or support for his contention.

As the Attorney General asserts, defendant did not object at trial to the testimony of Gonzales he now challenges on appeal. Because he failed to raise his objections at trial, defendant has forfeited his contentions. (Evid. Code, § 353; *Partida, supra*, 37 Cal.4th at p. 433.)

### C. Video Recording of Timothy's Prior Statements to an Investigator

Defendant asserts the trial court abused its discretion in admitting exhibit 31, portions of Timothy's prior recorded statement given to law enforcement. According to defendant, the recording contained prior consistent statements and did not satisfy either of the alternative requirements of Evidence Code section 791, the hearsay exception for prior consistent statements.[15]

In advancing his contention, defendant recites the relevant procedural history at trial and quotes Evidence Code sections 1236 and 791. The entirety of defendant's analysis on the issue is: "Neither of the requirements of section 791 were established by the People that allowed the introduction of Exhibit 31 to the jury. Its introduction was improper and an abuse of discretion."

---

[15] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Defendant does not identify any statement or statements on the recording to which he objects. He does not refer to any statement or portion of the recording at all. Additionally, other than quoting Evidence Code sections 1236 and 791, defendant cites no authority to support his position. He offers no analysis on the subject. He also offers no argument or analysis addressed to prejudice.

" ' "A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." ' " (*People v. Leonard* (2014) 228 Cal.App.4th 465, 478, quoting *Denham v. Superior Court of Los Angeles* (1970) 2 Cal.3d 557, 564.) "It is the appellant's burden to demonstrate the existence of reversible error." (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Additionally, an appellant has the burden of demonstrating both error *and resulting prejudice*. (See, e.g., *People v. Coley* (1997) 52 Cal.App.4th 964, 972; see also Cal. Const., art. VI., § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].)

Defendant has not offered meaningful legal analysis supported by reference to any specific statement or statements complained of and citations to authority on this point.

Consequently, defendant has failed to adequately demonstrate both error and resulting prejudice.

### D. Asserted Character Evidence

During E.S.'s testimony, the prosecutor asked what defendant's reputation was. Defense counsel objected, stating, "whether this is character evidence or what it is, it's -- it is not relevant and maybe inadmissible." The court overruled the objection stating it "would allow it for proof of gang membership."

E.S. testified defendant "was down." He remembered telling investigators that defendant was "always the first one to fight, the first one to want to do something." E.S. testified he had seen defendant with guns.

The court also admitted Pimentel's testimony that defendant spent time in juvenile hall, set forth *post*.

Defendant asserts the trial court abused its discretion in admitting character and/or reputation evidence in the form of the foregoing testimony.

Evidence Code section 1101 provides, in part: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." As this court has previously noted, "[c]ourts subject other crimes evidence to ' "extremely careful analysis" ' [citation] and review the admission of such evidence for abuse of discretion." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)

E.S.'s testimony that defendant "was down," was "always the first one to fight, the first one to want to do something," and that he had seen defendant with guns was not offered to prove defendant's conduct on June 29, 2016. With regard to the gang

40

enhancement allegations, the prosecution had the burden of proving, among other things, defendant committed the relevant crimes "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§§ 186.22, subd. (b)(1);190.2, subd. (a)(22).) To prove active participation in a criminal street gang, the prosecution had to prove defendant's participation was more than "nominal or passive" and that he "willfully promote[d], further[ed], or assist[ed] in any felonious criminal conduct by members of that gang . . . ." (§ 186.22, subd. (a); 109.2, subd. (a)(22); *Albillar, supra,* 51 Cal.4th at p. 56.) E.S.'s testimony was relevant to prove these elements as well as motive. Thus, defendant's challenges to this testimony as character evidence and on relevance grounds are meritless.

As for the testimony that defendant was in and out of juvenile hall when he was younger, as the Attorney General notes, this testimony was elicited by defendant's attorney on cross-examination. The Attorney General asserts that, if there was any error in the admission of this testimony, it was invited error and defendant is precluded from challenging the evidence on appeal. Apart from invited error, we conclude the contention is forfeited. The doctrine of invited error assumes there was an error. The trial court did not err in allowing the testimony because it was not asked to rule on its admissibility or make any other ruling regarding it. Defendant cannot object to its admissibility now when no objection was made in the trial court.

Immediately prior to eliciting this testimony on cross-examination, defense counsel asked about defendant's rap lyrics and whether they are typically filled with thoughts of violence against other gang members. Defense counsel then asked, "And do you know if the item that you read was written when [defendant] was in the juvenile hall?" Pimentel responded that he was not sure. When defense counsel then asked, "But he was in juvenile hall for a period of time, correct," Pimentel responded, "He's been in and out of the juvenile hall for a period of time." No objection was made to this answer.

41

In our view, counsel plainly elicited this testimony with the tactical goal of implying defendant wrote the rap lyrics when he was younger, in juvenile hall, more remote in time to the shooting than if he had written them more recently. He registered no objection to the testimony. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, *supra*, 37 Cal.4th at p. 435.) Any contention that it was improperly admitted is forfeited.

### E.  Testimony About A.B.'s Family

Defendant asserts the trial court abused its discretion in admitting testimony from N.S. and Elizabeth about A.B.'s family. Defendant asserts this evidence was not relevant to any issue in the case.

Asked if she knew whether A.B. had a family, Elizabeth testified she knew A.B. had a son and a "baby mamma." Defendant did not object to Elizabeth's testimony. Accordingly, he has forfeited any contention with regard thereto. (See Evid. Code, § 353; *Partida, supra*, 37 Cal.4th at p. 433.)

During N.S.'s testimony, the prosecutor asked N.S. to describe what N.S. knew about A.B.'s family. Defense counsel objected on relevance grounds, to which the prosecutor responded, "[g]oes to how well he knows him." The court allowed the testimony. N.S. testified, "I know he -- he had a kid about the age of my daughter . . . ." He continued: "I know he loved them. I know they were separated, but he checked in on him from time to time, all the time, actually, like every day he stop by, pick him up from his brother's house or cousin's house." N.S. testified A.B. had been with his child that night prior to the shooting.

We agree with defendant that this portion of N.S.'s testimony was not relevant as it did not have "any tendency in reason to prove or disprove any disputed fact that is of

42

consequence to the determination of the action."**16** (Evid. Code, § 210.) We further conclude, however, that the admission of this evidence did not prejudice defendant.

Generally, the standard for evaluating prejudice articulated in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), applies to state law evidentiary error. (See, e.g., *People v. Benavides* (2005) 35 Cal.4th 69, 91 [erroneous admission of irrelevant evidence harmless under *Watson*; defendant's unpreserved constitutional claims fail on the merits because, generally, violations of state evidentiary rules do not rise to the level of federal constitutional error]; *People v. McDaniel*, 38 Cal.App.5th 986, 1005 ["Evidentiary errors under state evidence rules are evaluated under the 'reasonable probabilit[y]' standard of prejudice announced in" *Watson*].) Defendant does not assert any other standard applies. Indeed, defendant does not address prejudice on this issue at all.

Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.) The *Watson* test " 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956.) The evidence establishing defendant's guilt here was compelling.

---

**16** We reject the Attorney General's argument on appeal that this questioning was proper to establish bias by N.S., as if that was the prosecutor's goal in this line of inquiry. There would be no reason for the prosecution to establish N.S. knew A.B well and that N.S. was therefore biased in favor of A.B.

At 12:38 a.m. the morning of the shooting, defendant, A.P., and Jose Epps got into A.P.'s car and left the parking lot at the Cottonwood Street address in the Four Corners area. Defendant was in the front passenger seat. They passed some vehicles and someone in the car insisted A.P. turn around. Defendant and Epps wanted to "check somebody" to see why they were in the neighborhood. Defendant and Epps exited A.P.'s car, and, shortly thereafter, A.P. heard one or two shots. N.S., in A.B.'s car at the time, saw a car approach, saw someone get out of the front passenger seat, heard someone say, "fucking scraps," a derogatory term Norteños use for Sureño gang members, and heard two or three shots. He then saw someone with a rifle or shotgun run back to the car and get in the front passenger side. Timothy also saw someone get out of the dark-colored car and shoot A.B. with a shotgun from a couple of feet away. After defendant got back in the car, A.P. noticed he had a bleeding cut under his eye. She thought defendant got hit in the face when he held up the shotgun.

E.S. testified that defendant admitted shooting A.B. Defendant said he "had a family incident and he was going through" and that it was "karma for killing" A.B. Defendant told E.S. that Epps was with defendant when defendant killed A.B. E.S. testified he had previously seen defendant with the shotgun that was used to shoot A.B. E.S. observed a cut under defendant's eye. Defendant told him that he had held the shotgun "like a sniper," and the shotgun had kicked back into his face.

With regard to the rumor Izzy Alvarez was involved in the shooting, defendant told E.S. he "couldn't care, let him take the fall for it." While at some point, Alvarez told E.S. he was the one who killed A.B., a few months later, Alvarez admitted to E.S. he was not the shooter.

Defendant was a member of and active participant in the VBN gang, a subset of the Norteño gang. A.B. had been validated by Davis Police as a Sureño and he associated with the East Side Trece Sureño subset, enemies of VBN. Defendant's gang tattoos, lyrics or writings found in defendant's notebooks, photos and a video of

44

defendant overwhelmingly supported the premise that defendant was a very active VBN member who felt great hostility towards Sureño gang members and would act out violently against them.

Subsequent to the murder, a shotgun was found in defendant's home and he was previously depicted on video discharging a shotgun and yelling "Bosque scrapas"— "Bosque" referencing defendant's gang and "scrapas" being a derogatory term for his enemies, the Sureños.

Given this evidence, it is not reasonably probable that, had the trial court not permitted N.S. to testify as to what he knew about A.B.'s family, the jury would have reached a result more favorable to defendant. (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.)

## IV.  Cumulative Error

Defendant asserts that the cumulative effect of the errors he alleges prejudiced him, mandating reversal. We reject this contention. The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal. (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.) We have concluded defendant's claims of error are without merit with the exception of the error related to the introduction of testimony concerning A.B.'s family, where we found the error to be harmless. Thus, there is no cumulative effect of error to consider. "Defendant was entitled to a fair trial but not a perfect one." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) Defendant was not deprived of a fair trial.

*****

45

## DISPOSITION

The judgment is affirmed.

/s/
_____
MURRAY, Acting P. J.

We concur:

/s/
_____
HOCH, J.

/s/
_____
KRAUSE, J.